```
 1                                    VOL. I
                                      Pp. 1 - 138
 2                                    Exhibits:  None

 3            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 4

 5                                 C.A. NO. 04CV11557

 6
      * * * * * * * * * * * * * * * * * *
 7
    JOSEPH BOOK,
 8
          Plaintiff
 9
    VS.
10
    DEPARTMENT OF STATE POLICE,
11  COMMONWEALTH OF MASSACHUSETTS,
    STATE TROOPER KURT M. FERRAZZANI,
12  STATE TROOPER SMITH, STATE
    TROOPER McKENZIE, AND STATE
13  TROOPER HENNIGAN,

14        Defendants

15    * * * * * * * * * * * * * * * * * *

16

17        Deposition of ALBERT McKENZIE, a witness called

18  by counsel for the Plaintiff, pursuant to the

19  applicable rules, before Lorreen Hollingsworth,

20  CSR/RPR, CSR NO. 114793, and Notary Public in and for

21  the Commonwealth of Massachusetts, at the Offices of

22  Hinckley, Allen & Snyder, LLP, 28 State Street,

23  Boston, Massachusetts, on Monday, September 18, 2006,

24  at 10:30 a.m.
```

Page 34

```
 1       more than, whatever, 10 -- a count of 10,
 2       something to that effect.
 3             Same thing with the nine-step
 4       heel-to-toe, basically could not -- never
 5       touched heel-to-toe.  I've had that before
 6       or missed on this step, that step, that
 7       step.  And unable to -- and almost falling,
 8       something to that effect.  Whatever I've
 9       seen is basically what I'd write.
10  Q    Why do you write that?  Why do you put
11       those results in the report?
12  A    Because they told me to and I have to, and
13       it's going to court, and we're charging the
14       party for operating under the influence.
15  Q    Who told you to?
16  A    Well, at the academy when we got our report
17       writing; from all my training with my field
18       training officers; from testifying in court
19       that you'll need it in your report so that
20       you can refresh your memory when you
21       testified.  So I guess everybody.
22  Q    What other things were you taught to put
23       into the report?
24  A    I try to put in enough so you refresh your
```

Page 35

```
 1       memory of the incident, so you can read the
 2       report and later testify, and enough,
 3       obviously, for the elements of the crime
 4       why.
 5  Q    After the police academy, you testified
 6       that's where you met Trooper Ferrazzani,
 7       did you see each other after that, prior to
 8       June 6, '01?
 9  A    Just on occasion.  And just so you know, I
10       mean, let's make it perfectly clear, our
11       class was close to 200, over 200 people.
12       So there are a lot of people in my academy
13       class that I might recognize by face and
14       couldn't tell you their name.
15             So there were four platoons,
16       and it was huge.  It was one of the biggest
17       classes, I think, we ever graduated, the
18       71st.
19  Q    Did you know him by name before this
20       incident on June 6th?
21  A    Oh, yeah, from -- I think mostly from
22       bumping into Kurt during patrol, as far as
23       he's out of A5, I'm out of A6, you know,
24       our areas meet.
```

Page 36

```
 1  Q    Have you ever socialized with him?
 2  A    No.
 3  Q    How often have you seen him since June 6,
 4       2001?
 5  A    I can't (sic) count on my hands, you know,
 6       less than.
 7  Q    You can't count on your hands?
 8  A    No, I can't (sic) count on my hands how
 9       many -- I mean, less than five.
10  Q    You can count on your hands?
11  A    Can count, I apologize.
12  Q    My hearing is not so great.
13  A    It would only be when Kurt was doing an
14       invest or something, he happened to be in
15       the barracks or something.  But other than
16       that, no.
17  Q    When Kurt was doing an "invest"?
18  A    If he's doing an invest or something in our
19       area for his unit and he might be in the
20       barracks typing something up or running
21       something.  But that's pretty much it.
22  Q    Have you received any promotions since
23       being with the Massachusetts State Police?
24  A    I guess you get that automatic one when you
```

Page 37

```
 1       become a senior trooper after so many
 2       years, but ...
 3  Q    Are you a senior trooper?
 4  A    Yes.
 5  Q    Forgive me for asking, have you been
 6       subject to any disciplinary action?
 7  A    Yes.
 8  Q    Can you explain that?
 9  A    There were two -- what do they call them?
10       Letters of counseling.
11  Q    Can you describe when those were and what
12       they entailed?
13  A    You know, as far as when they were, I
14       believe they were all, like, -- I was still
15       out of A6 on both of them.  So it was
16       probably 2004/2005 -- one was swearing.
17  Q    In what context?
18  A    Well, young man decided not to -- I was
19       trying to stop him -- long story short --
20       he slowed down; wouldn't get out of the way
21       of the cruiser; I went by him; he rolled
22       down his window; he yelled something at me;
23       I then pulled him over; and there was a
24       confrontation.
```

10 (Pages 34 to 37)

Page 38

| | | |
|---|---|---|
| 1 | Q | So a confrontation between you and a |
| 2 | | suspect? |
| 3 | A | No, between a motorist that got a citation |
| 4 | | and was irate. |
| 5 | Q | What words were used by you? |
| 6 | A | Did I say to him? |
| 7 | Q | Yes. |
| 8 | A | Well, I said to him, specifically, Do I |
| 9 | | look like one of your fucking friends? |
| 10 | Q | How old was this person? |
| 11 | A | This person was probably late 20s, early |
| 12 | | 30s. |
| 13 | Q | And where did this occur? |
| 14 | A | This occurred on Route 128 Danvers into |
| 15 | | Peabody. |
| 16 | Q | What race was the person? |
| 17 | A | I believe he was white. |
| 18 | Q | Did you give the person a citation? |
| 19 | A | I did. |
| 20 | Q | Were you alone in the cruiser at the time? |
| 21 | A | Yes. |
| 22 | Q | And how did it come about that you |
| 23 | | received -- I'm sorry, you said this |
| 24 | | resulted in a letter of counseling? |

Page 39

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And how did it result in a letter of |
| 3 | | counseling? |
| 4 | | (Off the record) |
| 5 | Q | Before I ask that, you said, Do I look like |
| 6 | | one of your fucking friends? |
| 7 | A | Yeah, basically. I mean, I don't know the |
| 8 | | exact words, it's roughly -- that's pretty |
| 9 | | much it. |
| 10 | Q | Anything else that resulted in this |
| 11 | | reprimand or letter of counseling? |
| 12 | A | No. |
| 13 | Q | What were you cited for saying? Is that |
| 14 | | it? |
| 15 | A | Yeah, that's -- using the inappropriate |
| 16 | | language. |
| 17 | Q | And how did it go from -- what did you cite |
| 18 | | the motorist for? |
| 19 | A | Well, I eventually cited him for failure to |
| 20 | | yield. And I believe -- I'd -- I don't |
| 21 | | recall exactly. It might have even been a |
| 22 | | seat belt at the time. I'm not exactly |
| 23 | | sure. |
| 24 | Q | So you were trying to pass the motorist, |

Page 40

| | | |
|---|---|---|
| 1 | | and he was in front of you? |
| 2 | A | If you let me explain it initially. |
| 3 | Q | Sure. |
| 4 | A | Motor vehicle, high rate of speed, I |
| 5 | | started to clock it at 80 miles per hour, |
| 6 | | roughly 80 to 82 miles per hour. |
| 7 | | When he saw me clocking him, |
| 8 | | he slowed down to 50 miles an hour. The |
| 9 | | roadway I'm talking about is Route 128 |
| 10 | | southbound in the Danvers area. It's two |
| 11 | | lanes going northbound, two lanes going |
| 12 | | southbound. |
| 13 | | When he slowed down to 50, he |
| 14 | | stayed like that for well over a mile and a |
| 15 | | half into Peabody. He then pulled over to |
| 16 | | the right. I proceeded to go by him. He |
| 17 | | rolled down his window and yelled something |
| 18 | | that I believe was an obscenity and made a |
| 19 | | gesture towards me. |
| 20 | Q | What kind of gesture? |
| 21 | A | Threw his arm out. Other than that, I |
| 22 | | don't know. |
| 23 | Q | Were you tailing him prior to that point? |
| 24 | A | I was clocking him prior to that point. |

Page 41

| | | |
|---|---|---|
| 1 | Q | So you had been clocking him for a mile and |
| 2 | | a half going 50? |
| 3 | A | I had been clocking him a lot longer than |
| 4 | | that. I had been clocking him for a good |
| 5 | | mile at 80, was getting ready to pull him |
| 6 | | over, he observed me. He looked right in |
| 7 | | his mirror and he saw me, and he slowed |
| 8 | | down to 50 miles an hour. |
| 9 | | And then instead of moving |
| 10 | | over, he decided to stay like that. And |
| 11 | | then when he finally moved over, he decided |
| 12 | | to yell something at me. |
| 13 | Q | So you had been following him while he was |
| 14 | | going 50 for some distance? |
| 15 | A | Right, right. |
| 16 | Q | Did you have your flashers on? |
| 17 | A | No, no. |
| 18 | Q | How long had you been following him when he |
| 19 | | was going 50? |
| 20 | A | Probably over a mile. |
| 21 | Q | So for more than a minute? |
| 22 | A | I would say so. |
| 23 | Q | Why didn't you immediately put your |
| 24 | | flashers on an arrest him for speeding -- |

11 (Pages 38 to 41)

Page 42

1 charge him for speeding?
2 A One, we don't arrest anybody for speeding.
3 Q I'm using it colloquially -- give him a
4   ticket for speeding?
5 A To be quite frank, I had worked the
6   Esplanade the night before; I was tired;
7   and I was just going to go by him. I was
8   just going to say, Okay, fine. He gets the
9   picture, he's slowing down, I'm just going
10  to go by him.
11 Q Was there any physical contact between you
12   and the motorist?
13 A No.
14 Q Did you give him the ticket?
15 A I did.
16 Q And then what happened after that?
17 A As far as the complaint?
18 Q Yes.
19 A I believe he called Sergeant Alteri, and
20   right on the complaint that Sergeant Alteri
21   wrote out, he stated, If you get rid of the
22   ticket, I won't proceed with the complaint.
23 Q And then what did Sergeant Alteri do?
24 A He had to forward it. He had to move it up

Page 43

1   the chain.
2       He actually was the day shift
3   sergeant at the time at A6. I actually was
4   working eves, the 3 to 11.
5 Q You were working 3 to 11?
6 A That night, the night of that incident.
7 Q So this happened after 11 p.m.?
8 A No. It was somewhere in between -- I think
9   it was probably maybe 4 or 5:00 in the
10  evening. You know, I worked 3 in the
11  afternoon to 11 at night. I still do.
12  That's the eve shift.
13 Q I don't mean to make too much of a deal of
14  this.
15      You said you worked 3 to 11,
16  you were tired because you had worked the
17  Esplanade the night before?
18 A I had worked the night before, my shift,
19  and subsequently had come in. It was the
20  July 3rd -- they do rehearsal thing which
21  isn't as bad as the July 4th.
22 Q So the next day you were on the job you
23  were still tired from the following (sic)
24  night?

Page 44

1 A I was pretty tired. I think I had worked
2   like a day detail.
3 Q I beg your pardon. I may have misspoke. I
4   meant to say you were still tired from the
5   previous night?
6 A Yeah. And I think I worked a day detail,
7   too. I don't recall exactly.
8 Q What did Sergeant Alteri do with the
9   complaint?
10 A He had to forward it. He told me. He
11  said, I listened to him. He told me
12  exactly what the guy said on the phone. He
13  said, If you get rid of the ticket, I won't
14  go forward with this complaint.
15 Q And what happened next?
16 A Well, they went up to the lieutenant, which
17  would be Lieutenant Livingston, who was the
18  station commander and still is, up there at
19  A6. I typed a to/from, and I guess it goes
20  forward at some point, and the major calls
21  me in for my letter of counseling.
22 Q Who's the major?
23 A Major Kelly.
24 Q And what's a letter of counseling? What

Page 45

1   does that mean? Is that like a reprimand?
2 A It means -- yeah. Don't do that again; you
3   need to represent the Massachusetts State
4   Police in a more professional manner.
5 Q Do you still have a copy of that?
6 A I don't know if I do or not. It might be
7   somewhere -- I'm sure they have it. I
8   don't know.
9 Q Who would have that?
10 A I would imagine somewhere up in A Troop --
11  they'd have it, the headquarters. I can
12  check to see if I have it. I can check
13  around to see if I have a copy of it.
14 Q Is there a headquarters for all the
15  A troops?
16 A Yeah, Danvers. And just so you know, I
17  mean, since we're talking about it, the
18  party who made the complaint is a convicted
19  child rapist.
20 Q Did you know that at the time?
21 A No, I did not.
22 Q What about the second letter of reprimand?
23 A The second one? Well, that was for an
24  accident.

12 (Pages 42 to 45)

Page 46

| | | |
|---|---|---|
| 1 | Q | Can you tell what happened? |
| 2 | A | Sure. It was the end of my shift, Route 1 |
| 3 | | southbound in Lynnfield. I saw a car |
| 4 | | driving erratically. I was heading home. |
| 5 | | I moved from the second lane |
| 6 | | into the first lane with my lights |
| 7 | | activated, and I got rear-ended. |
| 8 | Q | I'm sorry, you moved from the left -- |
| 9 | A | I was in the middle lane. I watched this |
| 10 | | guy swerving in the first lane, kind of, in |
| 11 | | and out -- there's a little BDL there. |
| 12 | Q | When you say the first lane, you mean the |
| 13 | | right lane? |
| 14 | A | The right lane. I'm sorry. There are |
| 15 | | three lanes southbound and three lanes |
| 16 | | northbound in this area. |
| 17 | Q | You saw a car swerving in the right? |
| 18 | A | Yes. |
| 19 | Q | And what happened next? |
| 20 | A | I moved into the first lane and I got |
| 21 | | rear-ended. It wasn't a bad accident. |
| 22 | Q | Obviously, you were rear-ended by the car |
| 23 | | that was behind the car that was swerving? |
| 24 | A | Well, she was further back. I don't know |

Page 47

| | | |
|---|---|---|
| 1 | | where she came from. I was -- my attention |
| 2 | | was on the party swerving on Route 1 |
| 3 | | southbound in Lynnfield, kind of, near the |
| 4 | | Christmas tree shop. |
| 5 | Q | Had you been drinking? |
| 6 | A | Had he been drinking? |
| 7 | Q | Had you been drink? |
| 8 | A | Me? |
| 9 | Q | Yes. |
| 10 | A | I was working, no, absolutely not. |
| 11 | Q | Did anyone accuse you of drinking? |
| 12 | A | No. |
| 13 | Q | How bad was the accident? |
| 14 | A | Not bad at all. |
| 15 | Q | And how did it lead to a letter of |
| 16 | | reprimand or a letter of counseling? |
| 17 | A | I'll tell you exactly how. There's two |
| 18 | | ways to book an accident on a job. There's |
| 19 | | a Type 1, Type 2 accident. |
| 20 | | To make it a Type 2, I |
| 21 | | believe, a supervisor has to book it. And |
| 22 | | normally they'll issue a citation or |
| 23 | | whatever. |
| 24 | | A supervisor showed up at the |

Page 48

| | | |
|---|---|---|
| 1 | | scene -- |
| 2 | Q | Are these accidents involving troopers? |
| 3 | A | Right. |
| 4 | Q | So in cases of accidents involving |
| 5 | | troopers, what's a Type 1? |
| 6 | A | A Type 1 is no citation issued, no personal |
| 7 | | injury. I believe it's supposed to be |
| 8 | | under a thousand, $1,000, and basically a |
| 9 | | supervisor responds and says, Hey, Al, book |
| 10 | | the accident yourself. It's a Type 1; it's |
| 11 | | a minor accident. That's basically what |
| 12 | | happens. |
| 13 | Q | And what about Type 2? |
| 14 | A | Type 2 is obviously a more serious |
| 15 | | accident. There's personal injury, you |
| 16 | | know, citation issued, something to that |
| 17 | | effect, arrest made, something to that |
| 18 | | effect. |
| 19 | Q | Citation made to the officer? |
| 20 | A | It could. Potentially it could, from a |
| 21 | | supervisor that responds. |
| 22 | Q | I'm trying to understand. |
| 23 | | Are these any accidents |
| 24 | | whether or not the -- strike that. |

Page 49

| | | |
|---|---|---|
| 1 | | Type 1 and Type 2, are you -- |
| 2 | | do those refer to any accidents involving a |
| 3 | | trooper, whether the trooper is at fault or |
| 4 | | someone else is at fault? |
| 5 | A | Yeah, basically a supervisor makes a |
| 6 | | decision whether it's a Type 1 or a Type 2. |
| 7 | Q | In terms of fault, where does that fit into |
| 8 | | play? If it's the trooper's fault or |
| 9 | | someone else's fault, is that something |
| 10 | | that's looked at in terms of -- strike |
| 11 | | that. |
| 12 | | When there is an accident |
| 13 | | involving a trooper, is a decision made |
| 14 | | whether it was the trooper's fault? |
| 15 | A | Someone does, yes. |
| 16 | Q | And who makes that decision? |
| 17 | A | Well, normally a sergeant will respond to |
| 18 | | the scene and he can make a decision. And |
| 19 | | as it goes further up the chain, I'm sure |
| 20 | | at some point somebody up the chain of |
| 21 | | command can make that decision, too. They |
| 22 | | can change it and say either the trooper is |
| 23 | | at fault or the gentleman or the lady who |
| 24 | | hit the trooper is at fault. |

13 (Pages 46 to 49)

Page 50

1  Q   Okay. Is there a standard practice --
2      strike that.
3          When an accident occurs
4      involving a trooper, as a matter of policy,
5      is one of the trooper's supervisors
6      assigned to look into the cause of the
7      accident?
8  A   Well, a sergeant is. Hopefully you have a
9      sergeant assigned that night to your
10     barracks and then he can come out and be
11     designated to book the accident. But --
12 Q   I'm just asking in terms of a policy.
13         Is there a policy that in the
14     case of an accident involving a trooper the
15     accident is investigated to determine if
16     the trooper is at fault?
17 A   Well, the accident is investigated.
18         I don't -- you know, I don't
19     think they come there saying the trooper is
20     at fault or the other guy is at fault. But
21     you have to call a supervisor, basically.
22 Q   You have to call a supervisor, okay.
23         And what's the supervisor's
24     job when there's an accident involving a

Page 51

1      trooper?
2  A   Book the accident.
3  Q   Write the report?
4  A   Well, he should, he should. Again, in my
5      case he didn't.
6  Q   "Book the accident," means he writes the
7      report?
8  A   Right.
9  Q   Was a determination made in the case of
10     your accident whether you were at fault?
11 A   You know, I'd have to look at that letter
12     again, but I think they blamed it on me.
13 Q   And what reason did they give?
14 A   From me moving from the first -- excuse me,
15     that middle lane into that first travel
16     lane.
17 Q   You weren't charged?
18 A   No. I didn't get -- if you mean, did I get
19     a ticket?
20 Q   Yes.
21 A   No, I didn't. But then, again, no
22     supervisor booked the accident.
23         It turned into a Type 1, which
24     means I booked the accident.

Page 52

1  Q   Are those the only two disciplinary actions
2      you've faced?
3  A   Yeah, that I can remember. I mean, those
4      are the only two letters of counseling.
5  Q   Is there a limit to the number of letters
6      of counseling a trooper can receive?
7  A   No.
8  Q   In the case of the accident, when did that
9      occur?
10 A   Still out of A6, I was in the summer
11     uniform. I'm going to tell you, I don't
12     remember the exact date or time. I don't
13     have anything in front of me. I could
14     probably find out for you later.
15 Q   Give me your best recollection. Was it
16     more than two years ago, more than three
17     years ago?
18 A   No, it might have been, like, maybe a year
19     and a half ago, you know, something like
20     that. It was definitely in the summer. I
21     was in the summer uniform. I remember
22     that. And it was Route 1 southbound in
23     Lynnfield.
24 Q   What time of day?

Page 53

1  A   It was the end of the eve shift. It was
2      around 11:00. I was going home.
3  Q   How was the visibility?
4  A   It was fine. It was clear.
5  Q   How did the accident occur?
6  A   I moved from the second lane into the first
7      and a lady rear-ended me. I pulled over
8      the other guy. She pulled up next to me,
9      yelled at me that I cut her off. I said,
10     Okay, ma'am, go back behind me; I'll call
11     my supervisor.
12         I called my supervisor. I
13     dealt with the guy in front of me, which I
14     gave him a field sobriety test. He passed.
15     He passed the field sobriety test. I
16     issued him a citation for marked lanes.
17         My supervisor showed up, and
18     he said, Hey, Al, why don't you book it,
19     Type 1. And I said, Okay. And I booked
20     it.
21 Q   When I said how did it happen, what I meant
22     is, did you know that you were cutting in
23     front of another car?
24 A   No.

14 (Pages 50 to 53)

Page 54

| | | |
|---|---|---|
| 1 | Q | Where did the other car come from? |
| 2 | A | Behind me somewhere, first lane. |
| 3 | Q | You don't know? |
| 4 | A | Behind me -- well, I know they came from |
| 5 | | behind me. |
| 6 | Q | You don't know? |
| 7 | A | I don't know exactly what lane. |
| 8 | Q | Let's get to the accident in this case. |
| 9 | A | Sure. |
| 10 | Q | It occurred on Wednesday, June 6, 2001. |
| 11 | A | Yes. |
| 12 | Q | On Route 1 at the Route 60 intersection, |
| 13 | | Route 1 at the intersection of Route 60 in |
| 14 | | Revere at about 4:00? |
| 15 | A | Yes, sir, yes. |
| 16 | Q | How did you first hear about this accident? |
| 17 | A | Over the radio. |
| 18 | Q | Where were you? |
| 19 | A | My best recollection, I was down by Ocean |
| 20 | | Ave., down by the barracks. |
| 21 | Q | Which barracks? |
| 22 | A | In Revere. |
| 23 | Q | Why were you down there? |
| 24 | A | I was on, what they call, dedicated patrol, |

Page 55

| | | |
|---|---|---|
| 1 | | an overtime shift. |
| 2 | Q | Why would that cause you to be near the |
| 3 | | barracks in Revere? |
| 4 | A | Because that's where I was assigned. You |
| 5 | | get assigned the boulevard or you get |
| 6 | | assigned different places, and I believe my |
| 7 | | assignment -- that I can recall five years |
| 8 | | ago; I don't really remember -- was the |
| 9 | | boulevard, Revere Beach Boulevard. |
| 10 | Q | So you were doing overtime work? |
| 11 | A | Yes, I was. |
| 12 | Q | And your patrol in that overtime duty was |
| 13 | | Revere Boulevard? |
| 14 | A | I believe so. I don't know the exact |
| 15 | | patrol. |
| 16 | Q | I understand. Would that boulevard area |
| 17 | | normally be within the patrol area of the |
| 18 | | A5 barracks? |
| 19 | A | Yes. |
| 20 | Q | Is that something that's commonly done, |
| 21 | | where you might fill a need of another |
| 22 | | barrack's on overtime? |
| 23 | A | Well, this is how it's done. In the |
| 24 | | summertime, we get extra money, and that's |

Page 56

| | | |
|---|---|---|
| 1 | | where it goes, I believe, from the |
| 2 | | Commonwealth. We have extra patrols for |
| 3 | | the DCR roadways down in Revere and in |
| 4 | | Medford. And we get assigned those patrols |
| 5 | | by the detail office. |
| 6 | Q | What is DCR? |
| 7 | A | Oh, MDC. It used to be the old MDC; now |
| 8 | | they call it DCR, because they got rid of |
| 9 | | it. |
| 10 | Q | Instead of Massachusetts District |
| 11 | | Commission -- |
| 12 | A | Instead of the Metropolitan District |
| 13 | | Commission, I think they call it -- oh, I |
| 14 | | don't even know what the designation is. |
| 15 | | But it's called DCR instead of MDC. |
| 16 | Q | Are those extra patrols to account for |
| 17 | | higher traffic during the summer? |
| 18 | A | Oh, yeah. The boulevard is loaded in the |
| 19 | | summertime. |
| 20 | Q | Getting back to June 6, 2001, what did you |
| 21 | | hear on the radio? |
| 22 | A | That there was an accident at Route 1 |
| 23 | | southbound by Route 60. |
| 24 | Q | Anything more specific? |

Page 57

| | | |
|---|---|---|
| 1 | A | Not that I can recall, just pretty much an |
| 2 | | accident. |
| 3 | Q | That was a poor question. Any other |
| 4 | | information about the nature of the |
| 5 | | accident over the radio? |
| 6 | A | You know, I don't recall if there was |
| 7 | | anything else said. |
| 8 | Q | Were you directed to respond to that scene? |
| 9 | A | No, I just said I'd go. I'd just slide up |
| 10 | | there. I wasn't ordered, if that's what |
| 11 | | you mean. I wasn't ordered by anybody to |
| 12 | | go up there. |
| 13 | Q | Okay. So you went on your own? |
| 14 | A | I mean, at some point there could have |
| 15 | | been -- it could have turned into a more -- |
| 16 | | possibly on the radio, it could have said |
| 17 | | possible PI, Revere Fire in route. |
| 18 | | So, yeah, it sounded like it |
| 19 | | was getting to be a more serious incident, |
| 20 | | so I slid out there. |
| 21 | Q | What I'm trying to clarify is nobody |
| 22 | | directed you to go, is that correct? |
| 23 | A | Not that I recall. Nobody ordered me from |
| 24 | | the radio or anything. |

15 (Pages 54 to 57)